# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **ADETOKUNBO FAYEMI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 17-3210** |
| | ) | |
| **KESS ROBERSON,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

Now before the Court is Petitioner Adetokunbo Fayemi's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (d/e 1).  Because Petitioner is not entitled to relief, the § 2254 Motion is DENIED.

## I. BACKGROUND

### A.    Petitioner Was Found Guilty Following a Jury Trial

In 2002, the State of Illinois charged Petitioner with attempt (first degree murder) and heinous battery of Alice Minter by administering thallium and poisoning her.  The State also charged Petitioner with several counts of aggravated battery involving seven other individuals who were close to Minter.

The State's theory was that Petitioner poisoned Minter by putting thallium in her food and drink and that the other individuals were poisoned by consuming food and drink intended for Minter.  Petitioner's theory was that the ingestion of thallium was accidental.

The following facts are taken from the Illinois Appellate Court's decision on direct appeal and the decision affirming the dismissal of Petitioner's state amended postconviction petition.   See People v. Fayemi, 4-06-0729 (Ill. App. Ct. June 18, 2009) (d/e 10-1); People v. Fayemi, 2016 IL App (4th) 140480-U (d/e 10-2).  The Court presumes that the state court's factual findings are correct for the purposes of habeas review, and Petitioner bears the burden of rebutting such findings by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  In addition, the Court cites to facts in the trial court record to put Petitioner's claims in context.  Those facts are followed by a citation to the record.

Prior to trial, Petitioner filed a motion in limine to preclude reference to prior bad acts.  He also sought to suppress evidence taken from his residence, arguing that no probable cause existed for the search warrant and the warrant affidavit contained false and

misleading information. Following an evidentiary hearing, the trial court denied the motion to suppress. The trial court also granted petitioner's motion in limine in part but permitted the State to introduce other-crimes evidence pertaining to complaints to police by Petitioner's ex-girlfriend, Raydeane Routen, in 1996 to show motive, intent, absence of mistake, and modus operandi.

The trial commenced in September 2005. In his opening statement, retained defense counsel, John Rogers, indicated that Petitioner was going to testify:

> [D]efense counsel told the jury in his opening statement that the "truth in this case *** lies in the detail of what was really going on in [defendant and Minter's] relationship at this time, and you will hear evidence from the Defense about what that was." Counsel stated defendant had a journal and "kept meticulous notes about things that [were] going on in his life," which would allow the defense to present evidence "detailing exactly what was going on between the two of them in their lives at this time in the year 2002." Counsel also stated defendant "will testify" regarding food shared and eaten in the hospital.

People v. Fayemi, 2016 IL App (4th) 140480-U, ¶ 47 (deletions and corrections in original). In addition, defense counsel stated in his opening statement that Minter had an ongoing rodent problem in her home and told Petitioner that thallium can be used as a

pesticide.  Petitioner ordered the thallium, gave half to Minter, put some in a salt shaker, and distributed a portion in his own home because he also had a rodent problem.  See People v. Fayemi, No. 4-06-0719 at 23-24.

Several witnesses testified at trial.  The president of a Florida company that distributes chemicals testified that, on July 31, 2002, he took a call from a man identifying himself as Petitioner for an order of 50 grams of thallium sulfate.  The caller stated the chemical was for research and gave his home address in Springfield, Illinois.

Minter testified that she began dating Petitioner in 1999.   At some point, they became engaged and made plans to build or buy a home together.  In the summer of 2002, when Minter and Petitioner were experiencing "ups and downs" in their relationship, Petitioner told her she would be "six feet under" if she ever left him.

In August 2002, Minter began experiencing stomach, back, and chest pains.  In September, she began losing her hair and her back continued to hurt.  Minter was hospitalized, and Petitioner would bring her food and drink.  Minter eventually went into a coma.  Minter testified she had never heard of thallium before she

was poisoned with it and denied asking Petitioner for help in eradicating any rat or mouse problem. September 12, 2005 Tr. at 60 (d/e 21-3). On cross-examination, Minter testified that she lived near Lasley Disposal and, at times, would get mice in her garage. Also, on cross-examination, Minter admitted that she did not tell police about the "six feet under" statement in her detailed, videotaped statement to the police in 2004 and first mentioned it two to three weeks prior to the start of trial. September 12, 2005 Tr. at 92-100 (d/e 21-3).

Dr. Daniel Brown, an expert in toxicology, testified that thallium is a metal found in small quantities in the environment. Until the 1970s or 1980s, thallium sulfate was used as a rodent and ant killer. A gram of thallium—"like a quarter of a thimble full"—could kill an average person. Symptoms of thallium poisoning include gastrointestinal pain, muscle weakness, numbness of the hands and feet, headache, liver and kidney damage, and hair loss. Dr. Brown testified that Minter's blood showed a thallium level of 471 nanograms per milliliter. A normal person would show three to five nanograms per milliliter.

Minter's three sons, a niece, a nephew, and two friends testified that they suffered various symptoms after consuming food or drink at Minter's house or at the hospital. Each of the seven victims tested positive for thallium poisoning. By way of example, one victim became ill approximately a week after she had two cups of lemonade or tea at Minter's home. Another witness testified he drank apple juice that Petitioner brought to Minter's hospital room and immediately began having stomach pain. In addition, one of Minter's son's dogs, who was kept in Minter's garage, died during this time. The son later learned the dog had been poisoned with thallium.

Janet Winkler, a registered nurse with the Springfield Public Health department, inspected Minter's home in 2002 for potential sources of thallium. She observed multiple trash bags in the garage that had been torn open. She knew that a dog that died had been housed in the garage, so food samples and other substances from the garage were tested. See September 12, 2005 Tr. at 184 (d/e 21-3). Of approximately 50 samples, five tested positive for thallium. September 15, 2005 Tr. at 13-17 (d/e 21-6) (testimony of chemist Dr. Jack Morgan). A former environmental inspector for the

building and zoning department of the City of Springfield testified that there were approximately 10 cases of thallium poisoning a year nationwide. September 13, 2005 Tr. at 5 (d/e 21-4).

Dr. Brown testified that blood and urine samples taken from Petitioner in October 2002 showed readings consistent with someone who had not been exposed to thallium. Dr. Christopher Long, an expert in forensic toxicology, testified that Petitioner's urine sample from October 2002 showed an exposure to thallium that was consistent with someone who worked with the product as opposed to ingesting it.

The police executed a search warrant at Petitioner's house in October 2002. Springfield police officer Norvel Melton recovered a bottle containing a white powdery substance marked as thallium sulfate and other bottles labeled as potassium chlorate, mercury, sulfuric acid, and chloroform. Springfield police detective Paul Carpenter found an open cardboard box with shipping labels and an invoice for thallium. Detective Carpenter also found containers of potassium chloride, methyl alcohol, potassium iodine, potassium ferricyanide, ammonium hydroxide, sodium chloride, potassium hydroxide, glacial acetic acid, and calcium carbide. Springfield

police detective James Graham seized a glass saltshaker in Petitioner's kitchen, the contents of which later tested positive for thallium. A small pill bottle on top of Petitioner's refrigerator contained a liquid that tested positive for thallium.

Certain other-crimes evidence was also presented to the jury regarding Petitioner's ex-girlfriend, Raydeane Routen, who dated Petitioner from 1992 to 1995. Routen reported several incidents to the police: (1) a March 3, 1996 incident where Routen noticed defendant near her vehicle and then found that her vehicle's air vents were broken with a "gooey white powdery-type substance" in the vents, which later testified positive for potassium sulfate and potassium cyanide; (2) a May 1996 incident where Routen reported a silvery liquid substance in her vehicle which was later identified as mercury; (3) and a January 1996 incident where Routen reported finding an unknown substance in her vehicle, which later tested positive for chlorine. Routen was aware that Petitioner was not arrested in connection with those incidents. Routen also testified that Petitioner was possessive, demanding, and controlling when she was dating him.

The State also presented evidence that police officers went to Routen's home after the incident on March 3, 1996 and took some items from Routen's home. <u>See</u>, <u>e.g.</u>, Tr. at 25 (d/e 21-7) (Routen's testimony that the police took salt shakers and spices). Petitioner moved for a mistrial, arguing that the State failed to link Petitioner to any incident at Routen's home on March 3, 1996. Tr. at 34 (d/e 21-7). The trial court denied the motion for a mistrial and instructed the jury to disregard any testimony regarding Routen's home. Tr. at 40 (d/e 21-7).

Petitioner did not testify at trial. The trial court instructed the jury not to consider Petitioner's failure to testify in arriving at its verdict. The jury found Petitioner guilty of attempt (first degree murder) as to Minter and aggravated battery as to the other seven victims.

**B.    The Trial Court Denied Petitioner's Posttrial Motions**

In April 2006, Petitioner's newly retained counsel, Patricia Hayes, filed a supplemental posttrial motion alleging, among other grounds, that (1) Rogers was ineffective for telling the jury Petitioner would testify but later convincing Petitioner not to testify; (2) the search warrant affidavit included false information and material

omissions; (3) erroneous information was elicited at the suppression hearing; (4) the trial court erred by admitting other-crimes evidence; and (5) Rogers failed to investigate possible tampering of evidence by Detectives Graham and Carpenter.

The trial court held an evidentiary hearing on the posttrial motion, at which Rogers testified. Rogers testified he told the jury during his opening statement that Petitioner would testify. May 25, 2006 Tr. at 66 (d/e 21-9). Rogers stated that, prior to the start of trial, Petitioner intended to testify. Id. at 78. As the trial developed, Rogers recommended that Petitioner not testify. Rogers stated he recommended Petitioner not testify because (1) he thought the evidence developed as favorably as it could; (2) if Petitioner testified, the prosecution would be able to get into many of Petitioner's prior bad acts, including highlighted language in a book on suicide and murder and all of his notes; (3) Rogers received information from an unnamed local attorney who told him Petitioner testified as an alleged victim in a prior case involving a former girlfriend and the jury acquitted the former girlfriend and told the attorney it was because of the arrogant nature of Petitioner's testimony. Id. at 78-79, 91 (d/e 21-9).

Petitioner testified that Rogers was a liar and did not discuss the pros and cons of testifying.  Id. at 114.  Petitioner stated he "very much" wanted to testify at trial.  Id. at 120.

Rogers also testified that he was aware that Detectives Carpenter and Graham had been investigated for prior misconduct in other cases.  May 25, 2006 Tr. at 63 (d/e 21-9). Rogers served a subpoena on the Internal Affairs Division and a subpoena to obtain their personnel files.  Id.  The trial judge conducted an in camera inspection of those documents and precluded Rogers from examining those documents. Id.  Rogers testified he had no credible information on which to try to impeach Detectives Carpenter and Graham and, therefore, stipulated to the chain of custody at trial. Id. at 64.

The trial court denied the posttrial motion, finding Roger's representation was "one of competence." June 20, 2006 Tr. at 61 (d/e 21-11).  The trial court sentenced Petitioner to 25 years for the attempt (first degree murder) conviction and consecutive two-year terms on each of the seven aggravated battery convictions.

**C. Illinois Appellate Court Affirmed in Part and Vacated the Portion of the Sentencing Order Imposing Consecutive Sentences on the Aggravated Battery Convictions**

Petitioner appealed, arguing (1) the trial court erred in concluding probable cause existed to issue a search warrant; (2) false statements and material omissions in the warrant affidavit required suppression of certain evidence; (3) the trial court erred in admitting the other-crimes evidence; (4) the trial court erred in admitting evidence that Petitioner possessed 17 named chemicals that had no relevance to the charged offenses; and (5) the trial court erred in imposing consecutive sentences.  Appellant's Brief (d/e 10-3).  The Illinois Appellate Court affirmed in part and vacated that portion of the sentencing order imposing consecutive sentences on the aggravated battery convictions.  People v. Fayemi, 4-06-0729 (Ill. App. Ct. June 18, 2009) (d/e 10-1) (holding that attempt (first degree murder) was a triggering offense under 730 ILCS 5/5-8-4(a) requiring a consecutive sentence as to all other offenses but that the aggravated battery convictions were non-triggering offenses and the sentences were to run concurrently; therefore, once defendant's sentence for attempt (first degree murder) was discharged, the

sentences for aggravated battery must be served concurrently to each other).

The Appellate Court denied Petitioner's challenges to the search warrant and warrant affidavit. Id. at 10-19. In addition, the Appellate Court found that the trial court properly admitted the other-crimes evidence as evidence of modus operandi. Id. at 21. The Appellate Court held that evidence of the 17 chemicals Petitioner possessed was relevant to the State's case that Petitioner did not order thallium at Minter's request but for "his own nefarious initiative." Id. at 25. Finally, the Appellate Court remanded for a new sentencing order imposing concurrent sentences to follow Petitioner's sentence for attempt (first degree murder). Id. at 26.

Petitioner filed a petition for leave to appeal to the Illinois Supreme Court raising four grounds: (1) there was no substantial showing of probable cause to justify the search of Petitioner and his house; (2) suppression was required due to false statements and material omissions in the warrant affidavit; (3) the trial court erred by admitting other-crimes evidence regarding Routen; and (4) the trial court improperly admitted prejudicial evidence that Petitioner possessed 17 named chemicals which had no relevance to the

charged offenses.  <u>See</u> Pet. for Leave to Appeal at 8 (d/e 10-6).  On

November 25, 2009, the Illinois Supreme Court denied leave to

appeal.  <u>People v. Fayemi</u>, 234 Ill.2d 533 (2009).  On October 4,

2010, the United States Supreme Court denied certiorari.  <u>Fayemi</u>

<u>v. Illinois</u>, 131 S. Ct. 235 (2010).

## D.  The State Courts Denied Petitioner's Request for Postconviction Relief

In July 2010, Petitioner filed a pro se state court petition for

postconviction relief pursuant to 725 ILCS 5/122-1 to 122-7 (West

2010).  The trial court appointed counsel and directed the State to

respond.  The State filed a motion to dismiss arguing waiver, res

judicata, and lack of record support.  In December 2013,

Petitioner's appointed counsel filed an amended postconviction

petition.

The petition and amended petition alleged, among other

grounds, that the trial court erred by denying a mistrial following

the admission of other-crimes evidence and that the State and the

detectives knowingly used perjured statements during the motion to

suppress hearing.  The trial court held that these claims were

raised on direct appeal and barred by res judicata.  <u>See</u> Order (d/e 21-2).

The petition and amended petition further alleged that trial counsel was ineffective for claiming in the opening statement that Petitioner was going to testify, for not requiring the Court to admonish the jury on all four <u>Zehr</u> principles,[1] for failing to subject the State's case to meaningful adversarial testing, and for failing to investigate or prepare for trial. (The amended petition also claimed Petitioner was denied a fair trial because the Court failed to admonish the potential jurors with regard to Petitioner's right not to testify and that his failure to testify could not be held against him.)

---

[1] This is a reference to <u>People v. Zehr</u>, 103 Ill. 2d 472, 477 (1984), which held that "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence on his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him."  This principle has been codified in Illinois Supreme Court Rule 431(b).  Until May 1, 2007, the rule did not require the judge to ask the questions unless defendant's counsel asked the court to do so.  <u>See</u> <u>People v. Glasper</u>, 234 Ill. 2d 173, 187 n.2 (2009).  The parties did not provide the Court with the transcript of voir dire.  However, Petitioner's brief to the Appellate Court on postconviction review states that eight jurors were selected and sworn without anyone asking whether they understood and accepted that Petitioner did not have to testify and that the decision not to testify could not be held against him.  Brief at 4 (d/e 10-8).  The final four were asked whether they would require Petitioner to testify before finding him not guilty even if counsel advised him not to testify.  <u>Id.</u>  The State's brief indicates the jurors were informed that Petitioner was not required to present any evidence on his own behalf to prove his innocence and asked whether they had any concerns with this principle.  Brief at 3 (d/e 10-9).

<u>See</u> d/e 21-1). The trial court considered the record and the

standard enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668

(1984) and found no unreasonable assistance or prejudice. <u>Id.</u> The

trial court further found that Petitioner's claim that appellate

counsel was also ineffective was not supported by the record. <u>Id.</u>

Petitioner also claimed actual innocence based on newly

discovered evidence—an Illinois State police report of possible

misconduct by Detectives Carpenter and Graham. The trial court

found that this was not new evidence because the issue was

addressed at the posttrial hearing and the allegation of tampered or

planted evidence was not supported by the record because

Petitioner signed a stipulation regarding the evidence. <u>Id.</u>

Therefore, the Court granted the motion to dismiss the petition and

amended petition. <u>Id.</u>

Petitioner appealed. On appeal, Petitioner raised one claim.

Petitioner argued that he made a substantial showing that his trial

counsel was ineffective for promising the jury that Petitioner would

testify while advising Petitioner not to take the stand. Appellant's

Brief (d/e 10-8). Petitioner also argued that his appellate counsel

was ineffective for failing to raise on direct appeal the issue of trial

counsel's broken promise.  Id. at 22; see also id. at 23 (also asserting that, if posttrial counsel did not properly preserve the issue, then posttrial counsel was also ineffective).

On June 23, 2016, the Illinois Appellate Court affirmed, finding the trial court did not err in dismissing Petitioner's amended postconviction petition.  People v. Fayemi, 2016 IL App (4th) 140480-U.  The Appellate Court cited the standard under Strickland v. Washington.  The court noted that the failure to present testimony as promised was a serious deficiency but did not constitute ineffectiveness per se.  Id. ¶ 48 (quoting People v. Winkfield, 2015 IL App (1st) 130205, ¶ 20)).  The Appellate Court found the evidence of guilt overwhelming and concluded that, even if trial counsel's statements were objectively unreasonable, "we cannot say [trial counsel's] statements caused sufficient prejudice such that the outcome of [Petitioner's] conviction would likely have been different absent those statements and in light of the State's evidence."  Id. ¶ 50.  The Appellate Court further found that appellate counsel "cannot be said to have been ineffective for not raising the issue on direct appeal."  Id.

Petitioner sought leave to appeal before the Illinois Supreme Court. Pet. for Leave to Appeal at 13 (d/e 10-11). Petitioner asserted: "This Court should grant leave to appeal where trial counsel broke a promise that the accused would testify in a case where there was no confession and no witness to the criminal act." Id. at 13. In September 28, 2016, the Illinois Supreme Court denied leave. People v. Fayemi, 60 N.E.3d 876 (Ill. 2016).

**E.    Petitioner Filed His § 2254 Petition**

On September 25, 2017, Petitioner filed his Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody (d/e 1). Petitioner raised six grounds: (1) trial counsel was ineffective for telling the jury during opening statement that (a) Petitioner would testify but then advising Petitioner not to testify and (b) counsel would call Dr. Alphonse Poklis, a forensic expert, to testify but then failed to do so; and that posttrial counsel and appellate counsel were ineffective for failing to raise these claims; (2) there was no substantial showing of probable cause to justify the search of Petitioner and his house and the affidavit in support of the search warrant contained false allegations and material omissions of fact; (3) the trial court's denial of a mistrial following

the admission of improper other-crimes evidence denied Petitioner the right to a fair trial; (4) the trial court erred by admitting evidence that Petitioner possessed 17 chemicals that had no relevance to the charged offense; (5) the trial court failed to admonish potential jurors in voir dire that Petitioner had a right not to testify and that his failure to testify could not be held against him; and (6) he is actually innocent based on newly discovered evidence.

Respondent filed an Answer (d/e 9). On May 16, 2018, this Court granted Petitioner's request for appointed counsel and appointed the Federal Public Defender to represent him.

On November 2, 2018, counsel filed a Reply in support of the § 2254 Motion (d/e 21). Counsel addressed only one claim: that Petitioner received ineffective assistance of counsel by promising the jury that Petitioner would testify and then failing to call Petitioner to testify. Counsel also noted that he had "nothing to add to the remaining grounds for relief raised in the petition." Reply at 1, n. 1 (d/e 21).

## II. LEGAL STANDARD

Petitioner seeks relief under 28 U.S.C. § 2254. Before a federal court may review a claim raised in the § 2254 Motion, Petitioner must exhaust his state court remedies. That is, Petitioner had to present each claim in the Petition to the Illinois appellate and Illinois Supreme Courts (collectively the state courts) for a complete round of review on direct appeal or in post-conviction proceedings. Malone v. Walls, 538 F.3d 744, 753 (7th Cir. 2008). Petitioner had to present both the operative facts and controlling legal principles underlying each of the federal claims at issue. Id. (citing Williams v. Washington, 59 F.3d 673, 677 (7th Cir. 1995)). If Petitioner failed to properly present his federal claims to the state courts but there is no longer any corrective process available to him, he has procedurally defaulted that claim. Perruguet v. Briley, 390 F.3d 505, 513 (7th Cir. 2004) (a procedural default occurs when a petitioner failed to present the claim to the state court and that court would now hold the claim procedurally barred).

If Petitioner failed to adequately present any of his grounds for relief to the state courts, this Court may only review such grounds if

Petitioner demonstrates: (1) a cause for the failure and prejudice because of losing review on the merits or (2) that lack of review would result in a fundamental miscarriage of justice. Smith v. McKee, 598 F.3d 374, 382 (7th Cir. 2010). Cause means an objective factor, external to the defense, which prevented Petitioner from adequately presenting the claim to the state courts for discretionary review. Id. Prejudice means an error that so infected the trial that Petitioner's conviction violated due process. Id. A fundamental miscarriage of justice occurs only in the extraordinary case that includes evidence demonstrating innocence of the convicted petitioner. See Sawyer v. Whitley, 505 U.S. 333, 339 (1992).

Moreover, even if Petitioner adequately presented his claims to the state courts, the state court's "last reasoned opinion on the claim" receives substantial deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996. Woolley v. Rednour, 702 F.3d 411, 421 (7th Cir. 2012) (noting that deference is applied to the "last reasoned opinion on the claim"). The AEDPA states that this Court may not grant habeas relief unless the state court's decision was (1) contrary to, or an unreasonable application of,

clearly established Supreme Court precedent; or (2) rested on an unreasonable factual determination.   See 28 U.S.C. § 2254(d)(1), (2).  Meeting the AEDPA standard for relief is difficult:

> Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error … beyond any possibility for fairminded disagreement."

Burt v. Titlow, 571 U.S. 12, 19-20 (2013) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." Burt, 571 U.S. at 18 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

## III. ANALYSIS

### A.   Petitioner is Not Entitled to Relief on His Ineffective Assistance of Counsel Claims

Petitioner first argues that trial counsel provided ineffective assistance of counsel by promising the jury that Petitioner would testify and then failing to call Petitioner to testify. Petitioner argues that, because he did not testify, the jury never heard that Minter

purportedly asked Petitioner to order thallium for her to use as a rodenticide; that Petitioner gave Minter half of the thallium he ordered to use as a rodenticide; that Petitioner put some of the thallium in a salt shaker that he then used to spread thallium in his house to fight his own rodent problem; that Petitioner recommended Minter not distribute the thallium with her hands; and that Petitioner assumed that Minter took the thallium home to use against mice and rats. Petitioner also asserts that all of the reasons trial counsel gave for not calling Petitioner to testify were known to him prior to opening statement.

Petitioner argues he has satisfied §2254(d)(1) because (1) the Illinois Appellate Court applied a prejudice standard contrary to the standard established in <u>Strickland</u>; and (2) correctly applying <u>Strickland</u>, defense counsel's representation was objectively unreasonable and prejudiced Petitioner.

To succeed on a claim of ineffective assistance, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). The first prong is known as the "performance prong," and the second is known as the "prejudice

prong." Thomas v. Clements, 789 F.3d 760, 765 (7th Cir. 2015).
To satisfy the prejudice prong, Petitioner must show "that there is a
reasonable probability that, but for counsel's unprofessional errors,
the result of the proceeding would have been different." Strickland,
466 U.S. at 694. A reasonable probability is a "probability sufficient
to undermine confidence in the outcome." Strickland, 466 U.S. at
694. Failure to prove either prong is fatal to a claim of ineffective
assistance. Chichakly v. United States, 926 F.2d 624, 630 (7th Cir.
1991); see also Strickland, 466 U.S. at 697 ("If it is easier to dispose
of an ineffectiveness claim on the ground of lack of sufficient
prejudice ... that course should be followed.").

   As this Court noted above, to secure a writ under § 2254(d)(1),
Petitioner must show that the state-court adjudication resulted in a
decision that (1) was contrary to or (2) an unreasonable application
of clearly established federal law as determined by the United States
Supreme Court. Washington v. Smith, 219 F.3d 620, 627 (7th Cir.
2000). Strickland qualifies as clearly established federal law as
determined by the United States Supreme Court. Id.

   Petitioner argues that the Illinois Appellate Court's 2016
decision is contrary to clearly established federal law as determined

by the United State Supreme Court.  Specifically, Petitioner argues

the Appellate Court applied an incorrect prejudice standard.

In its decision affirming the dismissal of Petitioner's amended

postconviction petition, the Illinois Appellate Court identified

Strickland as the appropriate standard.  The Appellate Court

stated:

> A defendant's claim of ineffective assistance of counsel is
> analyzed under the two-pronged test set forth
> in Strickland v. Washington, 466 U.S. 668 (1984). People
> v. Cathey, 2012 IL 111746, ¶ 23, 965 N.E.2d 1109. To
> prevail on such a claim, "a defendant must show both
> that counsel's performance was deficient and that the
> deficient performance prejudiced the defendant." People
> v. Petrenko, 237 Ill.2d 490, 496, 931 N.E.2d 1198, 1203
> (2010). To establish deficient performance, the defendant
> must show his attorney's performance fell below an
> objective standard of reasonableness. People v.
> Evans, 209 Ill.2d 194, 219, 808 N.E.2d 939, 953 (2004)
> (citing Strickland, 466 U.S. at 687–88). Prejudice is
> established when a reasonable probability exists that,
> but for counsel's unprofessional errors, the result of the
> proceeding would have been different. Evans, 209 Ill.2d
> at 219–20, 808 N.E.2d at 953 (citing Strickland, 466 U.S.
> at 694).

People v. Fayemi, 2016 IL App (4th) 140480-U, ¶ 46.  This is a

correct statement of the prejudice prong of the Strickland

standard.  When examining the claim, however, the Appellate

Court referred to the prejudice standard as requiring that "the

result of the case would likely have been different" and "the outcome of his conviction would likely have been different[.]" Id. ¶¶ 48, 50.

Petitioner argues that, by stating that the standard was whether the result of the case would likely have been different, the Appellate Court applied a preponderance-of-the-evidence standard, which was specifically rejected in Strickland. See Strickland, 466 U.S. at 694. Petitioner further argues that the Appellate Court never acknowledged that a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." See Gutierrez v. Anglin, 706 F.3d 867, 871 (7th Cir. 2013) (noting that "a probability sufficient to undermine confidence in the outcome . . . does not require that a petitioner show that the deficient conduct more likely than not altered the outcome of the case").

The Seventh Circuit has held that "there is no error when a court has correctly noted the Strickland standard and then used an incorrect shorthand version when stating its conclusion." Woods v. Schwartz, 589 F.3d 368, 378 n.3 (7th Cir. 2009) (where the appellate court stated the correct

standard—whether "there is a reasonably probability that but for his counsel's unprofessional errors, the result of the proceeding would have been different"—but then ultimately held that the witnesses' testimony "would not likely have changed the outcome of [the] trial"). The state court is given the benefit of the doubt, and, where the state court stated the standard correctly, "it is more likely that the court stated its conclusion imprecisely than that it applied a different standard." <u>Stanley v. Bartley</u>, 465 F.3d 810, 813 (7th Cir. 2006) (citation omitted).

That is exactly what happened here. The Illinois Appellate Court correctly cited the <u>Strickland</u> standard but then used an incorrect shorthand version when stating it conclusion. Therefore, the Court finds that the Appellate Court's prejudice analysis was not contrary to <u>Strickland</u> and is entitled to deference. Applying that deference, the Court finds that the Illinois Appellate Court reasonably applied <u>Strickland</u> to the facts and circumstances of this case.

Moreover, even assuming the Illinois Appellate Court's decision regarding prejudice is contrary to law because it

misstated the Strickland prejudice prong, Petitioner is still not entitled to relief. If the Appellate Court's decision were contrary to Strickland, this Court reviews the prejudice prong de novo. Mosley v. Atchison, 689 F.3d 836, 851 (7th Cir. 2012).

A breach of a promise that the defendant would testify is not per se prejudicial. See Hampton v. Leibach, 347 F.3d 219, 260 (7th Cir. 2003) (finding that defense counsel's breach of the promises he made in opening statement—that the defendant would testify and that counsel would present evidence that the defendant was not in a gang—"was not so prejudicial that it would support relief in and of itself" but finding that the breach "underscore[d] the more important failure to investigate exculpatory occurrence witnesses"); Barrow v. Uchtman, 398 F.3d 597, 607 (7th Cir. 2005) (reaffirming the principle articulated in Hampton that unfulfilled promises to present personal testimony from the defendant are highly suspect but finding the instant case distinguishable because it was unlikely the defendant's testimony could have altered the verdict). Therefore, Petitioner must show prejudice.

Applying <u>de novo</u> review, the Court finds no reasonable probability that the outcome would have been different. The evidence, while circumstantial, was overwhelming. <u>See</u> <u>Hough v. Anderson</u>, 272 F.3d 878, 891 (7th Cir. 2001) (noting that "[a] verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record"); <u>United States v. Reyes</u>, 270 F.3d 1158, 1169 (7th Cir. 2001) (noting that "'[c]ircumstantial evidence is of equal probative value to direct evidence'") (<u>quoting</u> <u>United States v. Vega</u>, 860 F.2d 779, 793 (7th Cir. 1988) <u>abrogated</u> <u>on other grounds</u> by <u>United States v. Durrive</u>, 902 F.2d 1221 (7th Cir. 1990)).

The testimony that trial counsel promised—that Petitioner would testify and that the jury would hear testimony about Minter and Petitioner's relationship, that Minter asked Petitioner to order the thallium to use against rats and mice, and that Petitioner used some thallium in his own home and told Minter not to distribute the thallium with her hands—does not create a reasonable probability that the outcome would have been different in light of the overwhelming evidence against Petitioner.

The jury heard testimony that thallium poisoning was rare—10 cases a year nationwide. Petitioner brought Minter food and drink when she was in the hospital. Minter and seven people close to Minter who shared food and drink with her tested positive for thallium poisoning. Petitioner, Minter's fiancé, did not, and one expert testified that the level of thallium in Petitioner's urine was consistent with someone who worked with thallium but did not ingest it. In addition, thallium was found in a few items in the trash in Minter's garage—the garage where a dog that died of thallium poisoning had been kept. Minter denied having ever heard of thallium.

The jury heard evidence that Petitioner purchased thallium. Police found thallium in Petitioner's home, including in a salt shaker and in a liquid form. Police also found other chemicals in Petitioner's home.

Minter testified that Petitioner told her she would be "six feet under" if she left him. Petitioner's ex-girlfriend testified that Petitioner was possessive and controlling. The ex-girlfriend also testified about instances of chemicals being found in her car after

their relationship ended. Because of this overwhelming evidence, Petitioner cannot show prejudice.

Petitioner also argued in his § 2254 Petition that trial counsel made other promises to the jury that were not delivered. Appointed counsel did not address this argument. Specifically, Petitioner asserts he received ineffective assistance of counsel because his trial attorney failed to produce and call Dr. Alphonse Poklis, an expert in the field of forensic toxicology, for financial reasons and posttrial and appellate counsel failed to raise the issue in the posttrial motion and direct appeal. However, the record shows that Dr. Poklis's testimony was introduced by stipulation. See September 19, 2005 Tr. at 26-30. Therefore, Petitioner is not entitled to relief on this claim.

## B. Petitioner's Fourth Amendment Claim Fails to State a Cognizable Claim

Petitioner next asserts that the search of his house violated the Fourth Amendment. Specifically, Petitioner states that the fruits of the search of his house should be suppressed because there was no substantial showing of probable cause to justify the

search and because the affidavit in support of the search warrant contained false allegations and material omissions of fact.

Petitioner's claim is not cognizable in a § 2254 Motion. A court cannot grant federal habeas corpus relief to a state prisoner who argues that evidence introduced at trial was obtained in an unconstitutional search or seizure if the State provided an opportunity for full and fair litigation of the Fourth Amendment claim. Stone v. Powell, 428 U.S. 465, 494 (1976). The rationale for this rule is that the exclusionary rule is a judicially created remedy—not a personal constitutional right—and applying the exclusionary rule in the habeas context would not "appreciably augment the deterrence of improper police conduct." Hampton v. Wyant, 296 F.3d 560, 563 (7th Cir. 2002) ("What Stone requires is that states provide full and fair hearings so that the exclusionary rule may be enforced with reasonable (though not perfect) accuracy at trial and on direct appeal.").

In this case, Petitioner does not argue that the State did not provide an opportunity for full and fair litigation of the Fourth Amendment claim. The Court notes that the trial court held an evidentiary hearing on the motion to suppress and the Appellate

Court considered the claim on appeal.  See People v. Fayemi, No. 4-06-0729 at 10-19) (d/e  10-1).  Therefore, Petitioner was afforded an opportunity for full and fair litigation of the Fourth Amendment claim and is not entitled to habeas relief on this claim.

**C.    Petitioner's Claims that the Admission of Other-Crimes Evidence and the Denial of a Mistrial Denied Him a Fair Trial are Procedurally Defaulted and are Not Cognizable**

Petitioner argues that the admission of other-crimes evidence and the denial of a mistrial following the admission of other-crimes evidence denied him a fair trial.

Respondent argues that this claim is not cognizable under § 2254 because the claim only raises a state law evidentiary issue.  Respondent alternatively argues that the claim does not entail a misapplication of clearly established federal law because no Supreme Court precedent holds that violations of Illinois rules of evidence implicate due process.  Finally, Respondent argues that, if this Court construes the claim as a due process violation, the claim was not fairly presented to the state courts as a due process claim and is procedurally defaulted.

To the extent Petitioner raises a state law evidentiary issue-- that the trial court erred as a matter of state law by admitting the

prior crimes evidence—such a claim is not cognizable under § 2254.

Federal courts conducting habeas review are limited to deciding

whether the conviction violates the Constitution, laws, or treaties of

the United States.  28 U.S.C. § 2241; Estelle v. McGuire, 502 U.S.

62, 68 (1991).  Generally, a trial court's evidentiary decisions do not

implicate federal constitutional rights.  See Perruguet v. Briley, 390

F.3d 505, 511 (7th Cir. 2004); Estelle, 502 U.S. at 484 n. 5

(expressing "no opinion on whether a state law would violate the

Due Process Clause if it permitted the use of 'prior crimes' evidence

to show propensity to commit a charged crime").

　　To the extent Petitioner raises a due process claim, Petitioner

procedurally defaulted such a claim.  Petitioner did not fairly

present the due process claim to the state courts.  To fairly present

a claim, the petitioner must alert the state court to the federal

constitutional nature of the issue to permit the court to resolve the

issue on a federal basis.  Ellsworth v. Levenhagen, 248 F.3d 634,

639 (7th Cir. 2001).  Typically, the petitioner must present both the

operative facts and controlling law to the state court.  Id.  A court

focuses on four factors: whether the petitioner (1) relied on federal

cases that engage in constitutional analysis; (2) relied on state

cases that apply constitutional analysis to similar facts; (3) framed the claims in terms so particular as to call to mind a specific, constitutional right; and (4) alleged a pattern of facts within the mainstream of constitutional litigation.  Id.

Petitioner presented his other-crimes evidence claim to the state courts as an issue of state evidentiary law.  Petitioner cited solely state law and did not present the claim as a federal due process claim by citing federal law or referencing the Fourteenth Amendment.  Therefore, the due process claim is procedurally defaulted.

A petitioner can overcome a default by showing good cause for the default and resulting prejudice or by showing a fundamental miscarriage of justice would result if the claim were not addressed on the merits.  Smith, 598 F.3d at 382.  Petitioner has made no effort to make such a showing on this claim.  Petitioner is not entitled to relief on his claim that the admission of other-crimes evidence and the denial of a mistrial denied him a fair trial.

**D. Petitioner's Challenge to the Admission of Evidence that He Possessed Other Chemicals is Not Cognizable**

Petitioner challenges the admission of evidence that he possessed chemicals other than thallium.   Respondent argues that the claim is not cognizable, the claim does not entail a misapplication of clearly established federal law, and, even if the Court construes the claim as a due process violation claim, the claim is defaulted because Petitioner did not fairly present the due process claim as a federal claim in the state courts.

Petitioner raised his claim that the trial court erred by admitting the evidence that Petitioner possessed other chemicals at each level of the Illinois court system.  He framed this issue in the state courts and in this Court as a claim under state law, not a constitutional due process claim.   As stated above with regard to the other-crimes evidence, a trial court's evidentiary decisions do not implicate federal constitutional rights.  See Perruguet, 390 F.3d at 511.  Therefore, this claim is not cognizable on habeas review.

**E.** **Petitioner's Claim that the Trial Court Failed to Properly Admonish the Jury is Not Cognizable and is Procedurally Defaulted**

Petitioner asserts that the trial court failed to admonish the jurors in voir dire of Petitioner's right not to testify and that this failure to testify could not be used against him as required by People v. Zehr, 103 Ill.2d 472 (1984). See also Illinois Supreme Court Rule 431(b) (codifying Zehr).

Respondent argues that this claim is not cognizable because the claim only concerns a state-law issue. Respondent also argues that the claim does not entail a misapplication of clearly established federal law. Finally, Respondent argues that the claim is defaulted because Petitioner did not fairly present this claim in any form for a complete round of review on direct appeal or in post-conviction proceedings. Although Petitioner argues that ineffective assistance of trial, posttrial, and appellate counsel excuses this default, Respondent asserts that a claim of ineffectiveness must be presented to the state courts as an independent claim before it may be used to excuse a procedural default.

As noted above, a violation of a state court requirement does not entitle Petitioner to federal habeas relief. Federal law does not

require that prospective jurors be affirmatively asked if they agree with the Zehr principles. Rosario v. Akpore, 967 F. Supp. 2d 1238, 1250 (N.D. Ill. 2013) (holding that a violation of Illinois Supreme Court Rule 431(b) does not implicate a fundamental right or constitutional protection and only involves a violation of the Illinois Supreme Court rules); United States ex rel. Murithi v. Butler, No. 14-CV-3090, 2015 WL 1399511, at *12 (N.D. Ill. Mar. 23, 2015) ("Federal law does not require that prospective jurors be affirmatively asked if they agree with the Zehr principles[.]).

Moreover, Petitioner did not raise this specific claim through a complete round of review in the state courts. Petitioner only raised this claim in his amended petition for postconviction relief but did not raise the claim on appeal or in a petition for leave to appeal to the Illinois Supreme Court. See Am. Pet. of Post-Conviction Relief at 8 (d/e 21-1) (raising voir dire claim); Appellant's Brief at 4, 21 (d/e 10-8) (mentioning the facts pertaining to voir dire but not raising a voir dire claim); Pet. for Leave to Appeal at 4, 16 (d/e 10-11) (mentioning the facts pertaining to voir dire but not raising a voir dire claim). Consequently, the claim is procedurally defaulted, and Petitioner must show cause for the default and resulting

prejudice or a fundamental miscarriage of justice to overcome the default.  Smith, 598 F.3d at 382.

Petitioner asserts in his petition that cause for the procedural default is due to the ineffective of assistance of trial, posttrial, and appellate counsel not raising the claim.  However, "the assertion of ineffective assistance of counsel to excuse a procedural default in a § 2254 petition is, itself, a constitutional claim that must have been raised before the state court or be procedurally defaulted."  Lee v. Davis, 328 F.3d 896, 901 (7th Cir. 2003) (citing Edwards v. Carpenter, 529 U.S. 446, 453 (2000)).

Here, Petitioner did not raise an ineffective assistance of counsel claim on this ground—that counsel was ineffective for failing to insist on complete Zehr questioning or failing to raise the claim—through a complete round in the state court.  See Smith v. Gaetz, 565 F.3d 346, 352 (7th Cir. 2009) (to use ineffective assistance as the cause to excuse a procedural default, the petitioner was required to raise the ineffective assistance claim "at each level of state court review" in his initial post-conviction petition, in his appeal, and in his petition for leave to appeal to the Illinois Supreme Court).  Petitioner only raised the ineffective

assistance claim in his amended postconviction petition but did not raise the claim on appeal or in his petition for leave to appeal to the Illinois Supreme Court. Therefore, this ineffective assistance of trial, posttrial, and appellate counsel claim cannot constitute cause to excuse the procedural default. Petitioner is not entitled to relief on this claim.

**F.  Petitioner's Actual Innocence Claim Fails to State a Cognizable Claim**

Finally, Petitioner attempts to bring a free-standing actual innocence claim based on newly discovered evidence. Petitioner claims that two of the detectives who gathered evidence in his case—Detectives Graham and Carpenter—were fired in 2006 as a result of an investigation for official misconduct.[2] Petitioner does not allege that the investigation pertained to the detectives' conduct in his case. Petitioner asserts, however, that one of those detectives had access to thallium and personally collected urine samples from some of the victims without authorization, suggesting that the detective tampered with the evidence or planted evidence.

---

[2] The Court notes that Detective Carpenter was later reinstated.  See https://www.sj-r.com/x219189507/Fired-police-detective-ordered-reinstated (last visited January 3, 2019).

A claim of actual innocence is a gateway to assert a specific constitutional violation that would otherwise be foreclosed as untimely or by a procedural default. Arnold v. Dittmann, 901 F.3d 830, 836 (7th Cir. 2018). The Supreme Court has not recognized a free-standing actual innocence claim in a non-capital case. See McQuiggin v. Perkins, 569 U.S. 383, 391 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); Arnold, 901 F.3d at 837. Given the current state of the law, the Court finds that Petitioner's free-standing actual innocence claim is not cognizable.

However, even if a freestanding actual innocence claim were cognizable, the evidence of innocence must meet "an 'extraordinarily high' threshold." Tabb v Christianson, 855 F.3d 757, 764 (7th Cir. 2017) (quoting Herrera v. Collins, 506 U.S. 390, 392 (1993)). At the very least, the standard would require more convincing proof of innocence than is required to use actual innocence as a gateway to overcome untimeliness or procedural default. House v. Bell, 547 U.S. 518, 554 (2006). The standard necessary to overcome untimeliness or a procedural default requires a showing that, in light of new, reliable evidence, it is

"more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327 (1995).

Petitioner has not met this high standard. Petitioner only presents speculation that detectives, who allegedly committed misconduct in the past, might have tampered with the evidence in this case. Petitioner has not offered the type of convincing proof of innocence that would be required in a freestanding actual innocence claim for habeas relief. Therefore, Petitioner is not entitled to relief on his actual innocence claim.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Proceedings, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." When a district court rejects the constitutional claims on the merits, a certificate of appealability may be issued if the petitioner shows "that reasonable jurors would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Where a district court dismisses the petition based on procedural grounds, a certificate of

appealability should issue only when the petitioner shows both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. at 484; see also Jimenez v. Quarterman, 555 U.S. 113, 118 n.3 (2009). Applying these standards, the Court declines to grant a certificate of appealability.

## V. CONCLUSION

For the reasons stated, Petitioner's Petition (d/e 1) under 28 U.S.C. § 2254 for writ of habeas corpus is DENIED. The Court DECLINES TO ISSUE a certificate of appealabilty. CASE CLOSED.

**ENTERED: January 8, 2019**

**FOR THE COURT:**

**s/Sue E Myerscough**
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**